UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHIQUANDA SANDERS,

                        Plaintiff,

              v.

CITY OF ROCHESTER, NEW YORK, et al.,

                        Defendants.

_____

<u>DECISION AND ORDER</u>

15-CV-6074L

## **<u>INTRODUCTION</u>**

This action is by plaintiff Chiquanda Sanders ("Sanders") against the City of Rochester (the "City"), the Rochester Police Department ("RPD"), Police Investigator Charles LoFaso ("LoFaso"), and Police Officers John Does 1-10 (the "officers")[1] (collectively, the "defendants"). (Dkt. # 1).  Sanders alleges claims pursuant to 42 U.S.C. Section 1983, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and New York State statutory and common law, all of which arise out of the execution of a no-knock search warrant at her home.

Currently pending are the parties' cross-motions for summary judgment.  (Dkt. ## 35; 39).[2] Both motions are opposed.  (Dkt. ## 40; 41).  For the reasons stated below, defendants' motion for summary judgment is granted, and Sanders's motion for summary judgment is denied.  Sanders's Complaint (Dkt. # 1), therefore, is dismissed in its entirety and with prejudice.

---

[1] The Complaint states that the John Doe defendants are unknown, but all are "police officers who were involved in incidents occurring on or about December 3, 2013 which are the subject of this action."  (Dkt. # 1 at 1).

[2] In plaintiff's motion for summary judgment and her opposition to defendants' motion, she also seeks discovery sanctions pursuant to Rule 37(b) of the Federal Rules of Civil Procedure.  (*See* Dkt. ## 39-12 at 18-22; 41-6 at 2-3). This Decision and Order will resolve those motions as well.

## FACTS[3]

### A.    The Search Warrant

On December 2, 2013, the RPD began an investigation into the murder of Kemari "Mills" Hodrick, which occurred in Rochester, New York, on that day. (Dkt. # 35-1 at Ex. C). Dante "Shalanta" Rankin was the prime suspect. (*Id.*). As a result of information obtained through that investigation, LoFaso presented a search warrant affidavit to Monroe County Court Judge Victoria M. Argento ("Judge Argento"), seeking a no-knock search warrant for 18 Gladstone Street, Rochester, New York, 14611 ("18 Gladstone"). (*Id.* at Ex. D; Dkt. # 39-3 at 3-6) (the "Affidavit" or "Aff."). At that time, 18 Gladstone was Sanders's residence.

According to the Affidavit, LoFaso reasonably believed that certain items relevant to the homicide might be found at 18 Gladstone, including a black knit hat worn by Rankin when he shot Hodrick, handguns, ammunition, gun cleaning equipment, magazines, and holsters, photographs of Rankin holding weapons, and computers and cells phones. (Aff. at ¶ A).

LoFaso explained that after the murder on December 2, 2013, Rochester Police Investigator Jennifer Morales ("Morales") spoke with a confidential informant (the "C.I."). (Aff. at ¶ 5). The C.I. was "known to Investigator Morales and other members of law enforcement," and the C.I. had been "providing reliable information since 2005, which ha[d] led to the arrests of several individuals on narcotics, weapons, assault, and murder." (*Id.*).

---

[3] Neither party submitted a proper Opposing Statement pursuant to Local Rule 56(a)(2). For instance, defendants did not submit a formal opposing statement, and Sanders replied to only ten of defendants' statements. (*See* Dkt. ## 40; 41). Still, "this Court prefers to decide matters on the merits rather than on technicalities when reasonable and practicable[.]" *Merriweather v. City of New York*, 2015 WL 57399, *1 n.1 (S.D.N.Y. 2015). Therefore, the Court has conducted an "assiduous review of the record," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001), and has used the parties' submissions for the facts section, *Jackson v. Vill. of Ilion*, 2016 WL 126392, *1 n.1 (N.D.N.Y. 2016). Primarily, the Court has used the search warrant and search warrant affidavit, and the deposition testimony of Sanders, LoFaso, Investigator Jennifer Morales, Investigator David Swain, and Sergeant Mark Lee.

The C.I. told Morales that "a male who the CI kn[ew] by the name of Shalanta Rankin called the CI's house at approximately 3:38 p.m." on December 2, 2013. (Aff. at ¶ 5). The C.I. stated that he "kn[ew] Rankin, kn[ew] Rankin['s] voice, and ha[d] talked to Rankin on numerous other occasions." (*Id.*). During the phone call, the C.I. apparently "overheard" Rankin tell another participant on the call, who was in the C.I.'s house, that Rankin had "just shot 'Mills' in the chest." (*Id.*; *see also* Morales Dep. at 64).[4] Furthermore, the C.I. indicated that "Rankin called from telephone # 585-355-4606, which the CI observed on his/her caller identification box." (Aff. at ¶ 5). An investigation conducted by the Monroe Crime Analysis Center subsequent to Morales's conversation with the C.I., but prior to LoFaso drafting the Affidavit, revealed that the telephone number observed by the C.I. was the Time Warner landline for 18 Gladstone. (*Id.* at ¶ 6).

LoFaso represented to Judge Argento in the Affidavit that the RPD had Rankin in custody. (Aff. at ¶ 7). However, LoFaso believed probable cause existed to search 18 Gladstone for the items specified in the Affidavit "because 18 Gladstone Street, which is close in location to the murder scene, is upon information and belief a known drug location as well as the first known location to which the suspect [went] after the murder." (*Id.*). The homicide investigation revealed that Rankin went to 18 Gladstone based on the phone call placed to the C.I.'s residence, and the fact that the phone number viewed by the C.I. returned to 18 Gladstone. (Morales Dep. at 63).

LoFaso also requested that the search warrant be designated as a "no knock" warrant, pursuant to New York law. (Aff. at ¶ 9). LoFaso stated that 18 Gladstone was "a known drug location and the residence of a parolee named Darrell Taylor, who [was] believed to be selling

---

[4] Both parties submit portions of the deposition testimony of Morales (Dkt. ## 35-1 at Ex. H; 39-4 at 8-12; 41-2), and Sanders, (Dkt. ## 35-1 at Ex. G; 39-4 at 13-16; 41-1). For ease of reference, when referring to the submitted depositions, the Court will cite the page number on the deposition transcript, not the designation assigned by the Court's electronic filing system. The Court will also follow this method for the deposition testimony of LoFaso (Dkt. # 39-4 at 1-7), Investigator Swain (Dkt. # 35-1 at Ex. E), and Sergeant Lee (Dkt. # 35-1 at Ex. F).

drugs out of the location[.]" (*Id.*). In LoFaso's view, it was "reasonable to believe the giving of notice and authority may endanger the life or safety of the executing officers." (*Id.*). LoFaso and Morales testified that the search warrant for 18 Gladstone was a "high-risk warrant." (*See* Morales Dep. at 119; LoFaso Dep. at 38). This was due, in part, to the fact that the murder weapon was still outstanding at the time LoFaso applied for the search warrant, and that Rankin may have secreted the weapon at 18 Gladstone given the belief, based on the RPD's investigation, that he went to that location after the murder. (*See id.*).

It is indisputable that Judge Argento signed and issued the no-knock search warrant for 18 Gladstone on the basis of the Affidavit.[5] (Dkt. ## 35-1 at Ex. D; 39-3 at 1-2).

### B.    Execution of the Search Warrant

The parties do not dispute that RPD executed the no-knock search warrant on 18 Gladstone before noon on December 3, 2013. When the officers entered the house, Sanders was upstairs lying in bed with her baby grandson. (Sanders Dep. at 13-15). Some of the officers instructed her to come downstairs, which she did while only wearing a t-shirt and carrying jeans on her arm and her grandson on her hip. (*Id.* at 15).

As soon as Sanders came downstairs, Morales handcuffed her in front of her body. (*Id.* at 16). Sanders could still cradle her grandson while handcuffed. (*Id.*). Morales also "assisted [Sanders] in dressing the baby." (*Id.*). Sanders testified that she was handcuffed for about two hours while officers searched 18 Gladstone, (*id.* at 30), and that the "handcuffs w[eren't]

---

[5] The search warrant is signed but not dated. Sanders states that without a date, "the warrant is a nullity as it is not possible to know if it was executed within the required 10 days, making the invasion of Plaintiff's home by RPD members, on 12-3-13, invalid and illegal." (Dkt. # 41 at ¶ 2). Sanders's argument is disingenuous. The Affidavit attached to the search warrant is dated December 3 with no year. But as Sanders admits, LoFaso presented the Affidavit to Judge Argento "[t]he day after the shooting," which occurred on December 2, 2013. (Dkt. # 39-1 at 5). Sanders also does not deny, and in fact, affirmatively alleges and states throughout her papers, that the search was executed on December 3, 2013. (*See, e.g.*, *id.* at ¶ 15). Therefore, the omission of the date on the warrant does not render it null and void. It is clear that the search warrant was issued on the same day the search was executed, December 3, 2013, and, thus, there is no question that the search occurred within ten days of issuance of the warrant.

comfortable period," (*id.* at 50).  Morales testified that "it is common practice for entry on any search warrant that every individual for the safety of themselves and for [the executing officers], [be] handcuffed.  And they are usually asked to go to the ground and handcuffed behind their back.  Ms. Sanders was handcuffed in the front and never taken to the ground."  (Morales Dep. at 114).  Sanders does not dispute this.  Moreover, based on Sanders's account of the incident, she never complained to the officers about the handcuffs while the officers conducted the search.

After entering the house, two officers, Investigator Swain and Sergeant Lee, attempted to search the basement from the kitchen.  (Lee Dep. at 26).  When Lee opened the basement door, the two officers were confronted by Sanders's pit bull dog that was approaching the threshold of the basement door.  (Lee Dep. at 28; Swain Dep. at 41-44).  Swain described the dog as approaching the officers in a "quick," "aggressive[]" manner, with its "[t]eeth bared."  (Swain Dep. at 44, 46).  Lee testified that the dog was running up the stairs "in an attacking manner," at "full speed, growling, coming right towards [himself] and Investigator Swain."  (Lee Dep. at 28).  As a result, and within a matter of seconds of opening the basement door, Swain shot and killed the dog.  (Swain Dep. at 44).  Sanders did not witness this shooting.  (Sanders Dep. at 31).

No items identified in the search warrant were found at 18 Gladstone, except two cell phones, which the RPD took as evidence.  (Dkt. # 35-1 at Ex. I).  In addition, the officers seized other items from 18 Gladstone, including new/unused baggies, an electronic scale, and a notebook containing "drug plans" of Darrell Taylor, which the officers viewed as drug paraphernalia.  (*Id.*).  Taylor was present at 18 Gladstone and also detained during the search.  (Sanders Dep. at 19-20).  Sanders disputes that these items were used for illegal purposes.  (Dkt. # 41 at ¶ 11).

Sanders testified that the officers damaged her residence during the search.  (Sanders Dep. at 35).  Specifically, the door frame where the officers entered the house was damaged such that

the door was not secured at all. (*Id.* at 36). Moreover, there was blood in the kitchen and on the basement stairs from the dog. (*Id.*). Sanders stated that the officers "flipped upside-down" every bedroom, took out every dresser drawer and threw clothes everywhere, and scattered the contents of boxes Sanders had packed in preparation for her upcoming move. (*Id.*). Sanders also indicated that food from the refrigerator and cabinets had been thrown around in the kitchen. (*Id.*). In short, the house was "tore up." (*Id.* at 37).

Sanders also claims that her wrists were injured as a result of the handcuffs. (Sanders Dep. at 48). She testified that the day after the search, her wrists were bruised and she had rings around them, and she could not hold anything in her hands, apparently as a result of the pain. (*Id.*). After "a couple days" of "trying to figure it out by [her]self," she went to urgent care. (*Id.* at 48-49). There, she was given "some pills" to "help with [her] hands," and wrist braces for stabilization. (*Id.* at 49). Since that appointment, Sanders indicated that "some days are good, some days are bad with [her] wrists [and] with [her] hands," and she has only returned to the doctor to get her medicine refilled, and only uses her wrist braces when she starts to feel pain. (*Id.*). Other than the wrist injury, Sanders suffered no other physical injuries as a result of the search. (*Id.* at 51).


## DISCUSSION

### I.    Rule 37 Discovery Sanctions

Sanders devotes much of her papers to issues relating to discovery and seeks Rule 37 sanctions against defendants. The Court will begin with these issues as certain of those requests, if granted, could have a material impact on the parties' cross-motions for summary judgment. *See Glencore Denrees Paris v. Dep't of Nat'l Store Branch 1*, 2008 WL 4298609, *3 (S.D.N.Y. 2008).

The gist of Sanders's discovery argument is that defendants did not provide proper or timely discovery responses to her interrogatories. Based on defendants' alleged noncompliance, Sanders seeks to have certain, unspecified facts be taken as established, pursuant to Rule 37(2)(b)(2)(A)(i), and to have defendants' Answer stricken, pursuant to Rule 37(2)(b)(2)(A)(iii). (*See* Dkt. ## 39-12 at 18-22; 41-6 at 2-3).

Rule 37(b) sanctions "appl[y] to a party's disobedience with a Court Order to compel production of some sort. Absent such an Order, a movant is not entitled to Rule 37(b) sanctions." *Ventura v. Sinha*, 2005 WL 1798629, *5 (W.D.N.Y. 2005); *accord Salahuddin v. Harris*, 782 F.2d 1127, 1131 (2d Cir. 1986) ("The plain language of Rule 37(b) requires that a court order be in effect before sanctions are imposed").

Here, Sanders made a motion to compel discovery before United States Magistrate Judge Marian Payson on March 10, 2017. (Dkt # 19). But Judge Payson explicitly denied that motion. (Dkt ## 31; 33 at 34:24-25) (denying the motion to compel "for failure to have complied with the meet and confer obligation").[6] For this reason, Sanders's request for Rule 37(b) sanctions is denied, and the Court will decide the parties' summary judgment motions on the record submitted.[7]

---

[6] Judge Payson issued "guidance" to the parties related to the discovery disputes at oral argument. Judge Payson was clear, however, that her guidance was "not [a] final ruling[]" on the motion, and was meant only to "help [the parties] have a productive meet and confer[.]" (Dkt. # 33 at 20:10-15). Sanders's attempt to rely on this guidance throughout her motion papers as if it carried the same weight as a Court Order is, therefore, meritless.

[7] The Court also declines to exercise its inherent discretion to impose any type of discovery relief. Sanders filed a motion for an extension of time to complete discovery on February 26, 2018—four days after defendants filed their summary judgment motion. (Dkt. # 37). The Court denied that motion, yet left the door open for Sanders to make a motion pursuant Rule 56(d) in response to defendants' motion for summary judgment. (Dkt. # 38). However, Sanders made no such motion pursuant to Rule 56(d). Beyond not complying with the requirements of that rule, nowhere in her papers does Sanders argue that she could not respond to defendants' motion because she needed more discovery. Rather, Sanders merely states some of the discovery inquiries to which defendants purportedly did not respond and argues for sanctions. Furthermore, the fact that Sanders has made her own summary judgment motion implies that all discovery she needed was completed. *See, e.g.*, *Evans v. Canfield*, 2016 WL 6695811, *1 (W.D.N.Y. 2016).

## II.    Legal Standard for Summary Judgment

Summary judgment will be granted if the record demonstrates that "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A genuine issue of material fact exists only if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the court must view all ambiguities and inferences that may be reasonably drawn from the facts in the light most favorable to the non-moving party, *see Anderson*, 477 U.S. at 255. To defeat a motion for summary judgment, the non-moving party cannot rely "on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). Rather, the nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton Cty., New York*, 541 F.3d 464, 471 (2d Cir. 2008), *cert. denied*, 556 U.S. 1128 (2009).

"The same standard applies where the parties file cross-motions for summary judgment." *Specialty Nat'l Ins. Co. v. English Bros. Funeral Home*, 606 F. Supp. 2d 466, 470 (S.D.N.Y. 2009). (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)). "Each party's motion is examined independently, with the Court drawing all reasonable inferences against the party whose motion is under consideration." *Id.* (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

### A.    Plaintiff's Motion for Summary Judgment

Outside of discovery issues, Sanders's motion deals almost exclusively with the validity of the search warrant.  She argues that the search warrant was issued without probable because the Affidavit did not demonstrate that the C.I. was reliable, and because the Affidavit contained false statements, specifically with regard to whether 18 Gladstone was the residence of Darrell Taylor and a known drug location.  (Dkt. # 39-12 at 5-7, 12-18).

### Validity of the Search Warrant

"Under both the Federal and New York State Constitutions, all persons have a right to be free from arrest, search and seizure except on probable cause or pursuant to warrant." *Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 401 (S.D.N.Y. 2009).  "In deciding whether a search warrant is supported by probable cause, a judge must determine whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 465 (S.D.N.Y. 2008) (quotations omitted).  "[A] magistrate's determination that probable cause exists to support the issuance of a warrant is entitled to great deference from a reviewing court," and "[a]ny doubt about the existence of probable cause must be resolved in favor of upholding the warrant." *Bancroft*, 672 F. Supp. 2d at 401.  "Under this highly deferential standard of review, a plaintiff challenging a warrant for lack of probable cause 'faces a heavy burden.'" *Leon v. City of New York*, 2010 WL 2927440, *3 (S.D.N.Y. 2010) (quoting *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991)).

### 1.    Confidential Informant

Sanders challenges the credibility of the confidential informant.  (Dkt. # 39-12 at 6).  Yet the Affidavit details that Morales knew the C.I. and that the C.I. had been providing reliable information to Morales and other members of law enforcement since 2005—approximately eight

years prior to the Affidavit. (Aff. at ¶ 5). In addition, the C.I.'s information had "led to the arrests of several individuals on narcotics, weapons, assault, and murder." (*Id.*).

These details were sufficient to allow Judge Argento to conclude that the C.I. was credible and that the C.I. had proven reliable in the past. *See Bancroft*, 672 F. Supp. 2d at 402 (confidential informant credible where information provided "had led to the recovery of contraband in the past"); *see also Lynch*, 567 F. Supp. 2d at 466 (confidential informant credible because he/she "provide[d] accurate information regarding drug activity at locations that the [police department] already had under investigation"). In addition, Sanders has not provided evidence that the RPD knew or had reason to suspect that the C.I. was lying when he/she spoke to Morales about the December 2, 2013, phone call. Accordingly, the C.I.'s information could support a finding of probable cause for Judge Argento to issue the search warrant. *See Bancroft*, 672 F. Supp. 2d at 402 ("Reliance on information from a single confidential informant whom the police and the magistrate deem credible is enough to support a finding of probable cause.").

Sanders also suggests that defendants erred by not conducting an additional investigation as to whether the C.I.'s information was accurate. (*See* Dkt. # 39-12 at 10). This contention is without merit. Not only it is evident that the RPD needed to take prompt action in its investigation given the underlying crime—suspected murder—and the fact that the murder weapon was still outstanding, (*see* Morales Dep. at 119; LoFaso Dep. at 38), but the RPD was also entitled to base the Affidavit on information provided by a credible C.I. without a further investigation. *See Lynch*, 567 F. Supp. 2d at 466 ("Plaintiffs have cited no authority for the proposition that defendants were constitutionally required to seek additional corroboration, or that reliance on information provided by a single confidential informant whom the police and issuing magistrate deem credible is not enough to create probable cause.").

Therefore, Sanders's argument that the search warrant was invalid because it was based on information provided by the C.I. is meritless.

## 2. False Statements

Sanders contends that "crucial statements [in the Affidavit] . . . were false . . . such as that 18 Gladstone Street was a drug location, and that Taylor was operating a drug business from that location, and that Taylor was residing at that location." (Dkt. # 41-6 at 2). As proof, she points out that LoFaso's and Morales's testimony regarding the source of this information contradict each other. (Dkt. # 41-6 at 2). Sanders also argues that "[t]he fact that no drugs were found at 18 Gladstone Street demonstrate[s] the assertions made in the search warrant application were false[.]" (Dkt. # 39-12 at 18).

A person challenging the propriety of a search warrant issued on probable cause must make a "'substantial preliminary showing' that the affiant . . . knowingly and intentionally, or with reckless disregard to the truth, made a false statement in his affidavit, and that the false statement was necessary to the finding of probable cause." *Bancroft*, 672 F. Supp. 2d at 402 (citing *Rivera*, 928 F.2d at 602).

A false statement is material when it is "necessary to the finding of probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (quoting *Franks v. Delaware*, 438 U.S. 154, 156 (1978)), *cert. denied sub nom.*, *Lillis v. Golino*, 505 U.S. 1221 (1992). "Under the so-called 'corrected affidavits doctrine' courts look to the hypothetical contents of a 'correct' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the search as a matter of law." *Rivera v. City of Rochester*, 2015 WL 409812, *4 (W.D.N.Y. 2015). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the

probable cause determination[.]" *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000).

"The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id.* (quotations omitted).

The evidence cited by Sanders is insufficient to demonstrated that the search warrant was not supported by probable cause. First, the Court is not convinced that Sanders has raised a genuine issue of material fact that the assertions in the Affidavit were, in fact, false or that LoFaso recklessly disregarded the truth in making the Affidavit. Although no drugs were found at 18 Gladstone, the officers found items they viewed as drug paraphernalia. (*See* Morales Dep. at 88). Moreover, even if 18 Gladstone was not, in fact, Taylor's residence, he was nonetheless at that location when the officers executed the search warrant. (Sanders Dep. at 19-20). Errors contained in a search warrant affidavit caused by mere negligence or innocent mistakes do not establish falsity or reckless disregard. *See Calderon v. City of New York*, 2015 WL 2079405, *6 (S.D.N.Y. 2015).

In any event, Sanders has not demonstrated that the statements regarding 18 Gladstone being a drug house or Taylor's residence were material to the finding of probable cause. As mentioned above, the phone number from which Rankin supposedly called the C.I.'s house after the murder was linked to 18 Gladstone by the Monroe Crime Analysis Center. Indeed, Sanders testified that phone number was, in fact, the landline for 18 Gladstone. (Sanders Dep. at 36). This clarifies the accuracy of the information provided by the Monroe Crime Analysis Center to the RPD based on the phone number described by the C.I.

In addition, 18 Gladstone was close in proximity to the murder scene, a statement that Sanders does not dispute. Finally, the existing facts known to LoFaso at the time he drafted the

Affidavit led to the conclusion that 18 Gladstone was the "first known location" Rankin went after the murder. This was at least a reasonable conclusion even if 18 Gladstone was not, in fact, the first place visited by Rankin, because, again, the phone number from which Rankin supposedly called the C.I.'s house was the landline for 18 Gladstone.

In my view, then, even removing the disputed statements from the Affidavit, probable cause existed for Judge Argento to issue the search warrant for 18 Gladstone.

### 3. "No-Knock" Designation

To the extent that Sanders argues the "no-knock" designation was inappropriate, (Dkt. ## 39-12 at 12-18; 41-6 at 8-10), that argument is also without merit. No-knock warrants, under certain circumstances, are constitutional and permitted by New York law. *See* N.Y. CRIM. PROC. § 690.35(4)(b); *Lynch*, 567 F. Supp. 2d at 467 n.5. Here, LoFaso requested a no-knock warrant because he believed giving notice of the search "may endanger the life or safety of the executing officers." (Aff. at ¶ 9). Because the warrant sought, among other things, firearms and firearm equipment related to a murder that was committed a day prior to LoFaso drafting the Affidavit, it was reasonable for Judge Argento to approve the no-knock entry. *See* N.Y. CRIM. PROC. § 690.35(4)(b)(ii) (no-knock entry authorized "upon the ground that there is reasonable cause to believe that . . . the giving of such notice may endanger the life or safety of the executing officer or another person").

For the above-stated reasons, the search warrant here was issued on probable cause. This being the only basis for Sanders's motion for summary judgment, her motion is denied.

### B. Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment on all of Sanders's claims. The Court will address each in light of the determination that the search warrant was supported by probable cause.

1. **<u>False Imprisonment</u>**[8]

Sanders's false imprisonment claim is based on her view that she was unlawfully detained and held in handcuffs for the duration of the search—approximately two hours. This claim fails.

To state a claim for false imprisonment under federal or New York law, a plaintiff must show, among other things, that the confinement was not "otherwise privileged." *Signer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (citation omitted), *cert. denied*, 517 U.S. 1189 (1996). Police acting pursuant to a search warrant "are privileged to detain individuals, even to the point of handcuffing them, while the search is carried out." *Bancroft*, 672 F. Supp. 2d at 403. Moreover, "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 n.19 (1981)).

As discussed above, the search warrant for firearms and firearm equipment was supported by probable cause. The officers, then, were permitted to detain Sanders for safety purposes, even to the point of handcuffing her, while they conducted the search. *See Jackson v. Vill. of Ilion*, 2016 WL 126392, *5 (N.D.N.Y. 2016); *see also Bancroft*, 672 F. Supp. 2d at 403-04 ("The categorical nature of the officer's authority to detain during a search executed pursuant to a facially valid warrant means that no unconstitutional false arrest or imprisonment occurred in this case."). Accordingly, Sanders's false imprisonment claim is dismissed.

---

[8] Sanders rightly notes that defendants style her claim as one for false arrest rather than false imprisonment. (Dkt. # 41-6 at 3). Yet it is well-established in New York that these two claims are identical. *Leon*, 2010 WL 2927440 at *4 (citing *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991)). Therefore, the Court will apply defendants' argument regarding false arrest to Sanders's claim of false imprisonment. Moreover, while is it is unclear whether Sanders brings her claim under federal or state law, in either scenario, the claim "require[s] the same analysis." *Id.*

## 2.    Conversion and General Construction Law 25-b

These claims relate to property damage caused by the search.  Sanders asserts that the officers "tore up" her house by throwing personal items all throughout the house, confiscating personal items without returning them, and unnecessarily shooting and killing her dog.

Initially, the Court agrees with defendants that any theory of relief premised on the officers' seizure of evidence pursuant to the search warrant—such as cell phones—must fail.  The plain text of the search warrant permitted the officers to search for and seize cell phones at 18 Gladstone. (Search Warrant at ¶ A).  The officers were also permitted to seize the other items found during the search which they deemed to be drug paraphernalia.  Thus, any conversion claim based on those items is dismissed.

Furthermore, "it is well recognized that officers executing search warrants on occasion must damage property in order to perform their duty."  *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995) (quotations omitted).  "Before any due process liability can be imposed for property damage occurring in a lawful search, it must be established that the police acted unreasonably or maliciously in bringing about the damage," *id.*, and that "more than ordinary disarray and damage incident to the execution of the warrant occurred," *Kirkland v. City of New York*, 2007 WL 1541367, *7 (E.D.N.Y. 2007).

Here, significantly, Sanders has not put forth evidence that the executing officers acted unreasonably or maliciously in executing the warrant, or that the property damage exceeded that which was necessary under the circumstances to search for evidence related to the murder.  The door damage was reasonable based on the officer's authority to enter the premises without notice. The officers were also permitted to search for such items as guns and ammunition, gun cleaning equipment, a knit hat, photographs, and cell phones.  It was reasonable for the officers to search

places within 18 Gladstone where such items might be hidden, such as dresser drawers and boxes. Therefore, Sanders's claims related to this type of damaged property must be dismissed. *See, e.g.*, *Lynch*, 567 F. Supp. 2d at 463, 467 n.5 (no constitutional violation were officers "broke open locked interior doors, broke a bed, removed items from dresser drawers" and "ransack[ed] the whole place"; "there is no indication that the officers damaged plaintiffs' property to an extent beyond what was necessary to effectuate a complete search of the Residence"; "[the court] do[es] not doubt that [the property damage] resulted in inconvenience to plaintiffs, but the argument that it was a constitutional violation is baseless"); *Kirkland*, 2007 WL 1541367 at *7 (finding that damage to plaintiff's "antique table, the front door, door frame, and the wall near the door" did not amount to a constitutional violation; "[p]laintiff has failed to allege that such damage is anything more than ordinary disarray incident to the execution of the warrant, or that the officers' actions were malicious or unreasonable, given their reliance upon a valid search warrant").

In the Complaint, Sanders alleges a separate claim based on Investigator Swain's shooting and killing of her dog pursuant to New York General Construction Law Section 25-b.[9] (Dkt. # 1 at ¶¶ 36-37). In opposing summary judgment, Sanders attempts to switch legal theories, briefly arguing that the killing "was a violation of 42 USC 1983, if not a violation of the General Construction Law. The jury can find, based on the record as a whole, that the dog was a loving animal who was going towards its shooter to lick his face, not to attack, and the shooting was therefore unjustified." (Dkt. # 41-6 at 7).[10]

---

[9] New York General Construction Law Section 25-b states, "'injury to property' is an actionable act, whereby the estate of another is lessened, other than a personal injury, or the breach of a contract."

[10] Section 1983 does not create any substantive rights, but "rather serves as a vehicle for vindicating federal rights elsewhere conferred." *Strong v. Perrone*, 2018 WL 324421, *2 (W.D.N.Y. 2018) (quotations omitted). Presumably, then, Sanders meant that the killing violated her Fourth Amendment rights, not Section 1983, per se.

First, Sanders's argument does not specify any evidence that contradicts Swain's and Lee's account of the situation, notably, that the dog approached the officers in an attacking and aggressive manner. (Swain Dep. at 44, 46; Lee Dep. at 28). Indeed, Sanders admits that she did not witness the shooting. (Sanders Dep. at 31). Thus, any suggestion that the dog might have been approaching the officers to "lick [their] face[s]," is pure speculation, and insufficient to defeat summary judgment.

Moreover, Sanders provides absolutely no legal authority demonstrating General Construction Law Section 25-b's applicability to instances of the police shooting a pet dog during the execution of a valid search warrant.[11] For this reason alone, Sanders's claim pursuant to the General Construction Law fails. *See, e.g.*, *Cabisca v. City of Rochester*, 2017 WL 4221090, *9 (W.D.N.Y. 2017) (dismissing plaintiff's General Construction law claim related to defendant police officer's shooting of her dog; "[c]ounsel's briefing . . . is bereft of any citation to relevant legal authority . . . [and] [i]t is not the job of this Court to construct a reasonable analysis of how § 25-b of New York's Construction Law applies to the police shooting of a pet dog").

Even if Sanders brought this claim pursuant to the Fourth Amendment, which she did not do,[12] the claim would nonetheless lack merit. To succeed on this claim, the plaintiff bears the

---

[11] The dearth of legal authority in Sanders's memoranda of law is perplexing. Outside of discovery arguments, for which Sanders cites two cases, her memorandum of law in support of summary judgment cites no case law. Also, beyond attempting to distinguish two of defendants' cases, Sanders's memorandum of law in opposition to summary judgment contains no other case law. Of course, a memorandum of law with no relevant law does little to aid the Court is resolving dispositive motions.

[12] Sanders did not plead a claim pursuant to the Fourth Amendment related to the killing of her dog. Therefore, raising the claim for the first time in opposition to summary judgment is improper. *See Mahmud v. Kaufmann*, 607 F. Supp. 2d 541, 555 (S.D.N.Y. 2009) ("Generally, courts will not consider, on a motion for summary judgment, allegations that were not pled in the complaint and raised for the first time in opposition to a motion for summary judgment."), *aff'd*, 358 Fed. Appx. 229 (2d Cir. 2009) (summary order); *see also Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 WL 2914093, *6 (S.D.N.Y. 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion.").

burden of proving that such a seizure—the killing of a companion animal—was unreasonable under the circumstances. *See Carroll v. Cty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013).

As mentioned above, when the officers encountered the dog, it was approaching them in a "quick," "aggressive[]" manner, with its "[t]eeth bared." (Swain Dep. at 44, 46). In other words, this was not a situation in which the dog posed no immediate danger to the officers, or merely stood idly by while the officers searched the residence. Rather, the officers felt that the pit bull posed an imminent threat to their safety. Given the short time frame in which the officers had to react, Sergeant Lee testified that there was no other choice but to shoot the dog. (Lee Dep. at 31-32). In light of the undisputed evidence, this was not an unreasonable course of action. *See Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 271-72 (D. Conn. 2005) (finding that defendant officer could have "reasonably assumed that the dog posed an imminent threat to his safety and, therefore, his conduct [in shooting and killing the dog] did not constitute an unreasonable seizure"; "[i]n light of the important interest in the defendant's self-protection, and the split-second decision-making required, the seizure was not an unreasonable intrusion on plaintiff's Fourth Amendment rights").

Therefore, summary judgment in favor of defendants is appropriate on Sanders's claims of conversion and General Construction Law Section 25-b.

### 3. Excessive Force, Assault, and Battery[13]

Sanders alleges that the officers used excessive force on her by "yelling commands and pointing rifles" at her and her grandson and by handcuffing her. (Dkt # 1 at ¶¶ 21-22, 23-24, 29-30). In Sanders's view, any force used by the officers, specifically the use of handcuffs, would

---

[13] The Court will analyze these claims together. *See Brown v. City of New York*, 2013 WL 491926, *10 (S.D.N.Y. 2013) ("Assault and battery claims, when alleged against a police officer, are evaluated like excessive force claims.").

have been excessive because the officers "had no legal right to touch" her, and because she presented no danger to the officers executing the search warrant. (Dkt. # 41-6 at 5).

"To establish a section 1983 claim for excessive force, plaintiffs must show that the force used was excessive or unreasonable in light of the circumstances." *Lynch*, 567 F. Supp. 2d at 467 (quotations omitted); *accord Brown v. City of New York*, 2013 WL 491926, *10 (S.D.N.Y. 2013) ("Application of physical force is excessive when it is more than necessary under the circumstances.").

Here, it was neither unreasonable nor excessive for the executing officers to initially draw weapons and yell instructions towards the occupants of 18 Gladstone upon entering the premises. The officers were executing a valid no-knock search warrant for a location at which they believed firearms and firearm equipment connected to a recent murder were secreted. Therefore, it was not unreasonable *per se* for the officers to apply handcuffs to Sanders after entering the residence and detain her in handcuffs for the entirety of the search, especially considering that Sanders was handcuffed in the front of her body and the officers never took her to the ground in applying the handcuffs. (*See* Morales Dep. at 114). To the extent Sanders's claims are based on these actions, those claims must fail. *See Michigan*, 452 U.S. at 705 ("a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted"); *see also Bancroft*, 672 F. Supp. 2d at 404 ("the police were privileged to handcuff [plaintiff] incident to her temporary detention while they searched the premises, and they were privileged to move her into a safe area as well").

Assuming Sanders's claim rests on the theory that the handcuffs were applied too tight, the claim still fails. "[T]he hallmarks of this kind of claim are allegations that a police officer tightened handcuffs to an unreasonable degree, that the plaintiff protested to no avail, and that the

plaintiff suffered serious injury as a result." *Jackson*, 2016 WL 126392 at *7 (quotations omitted). "[I]f the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force." *Gonzalez v. City of New York*, 2000 WL 516682, *4 (E.D.N.Y. 2000).

As mentioned above, it was reasonable for the officers to apply handcuffs in detaining Sanders during the search. There is also no evidence that the handcuffs were tightened to an unreasonable degree. Significantly, Sanders testified merely that the "handcuffs w[eren't] comfortable period," not that she felt the handcuffs were too tight, and nothing indicates that Sanders either told the officers that the handcuffs were too tight or that she did make that complaint and the officers ignored her. (Sanders Dep. at 50). In addition, Sanders did not seek medical attention for her wrists during or immediately after the detention, and instead only went to urgent care for her wrist pain "a couple days" after the incident. (Sanders Dep. at 48-49). For these reasons, the use of handcuffs here did not amount to a constitutional violation. *See Jackson*, 2016 WL 126392 at *7 ("[plaintiff's] own narrative fails to include any indication that he ever felt that the handcuffs, once applied, were tight"); *see also Smith v. City of New York*, 2010 WL 3397683, *13 (S.D.N.Y. 2010) ("A handcuffing cannot be expected to be comfortable, and there is nothing in plaintiff's testimony to suggest that this handcuffing was unreasonably tight."), *aff'd sub nom., Smith v. Tobon*, 529 Fed. Appx. 36 (2d Cir. 2013) (summary order).

Accepting as true Sanders's assertion that her wrists and hands were injured and she continues to have pain as a result of the handcuffs, those facts, alone, are insufficient to survive summary judgment on her excessive force claim because there is no evidence the officers used more force than necessary to detain Sanders. *See Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 308 (D. Conn. 2009) ("reasonable force does not become unconstitutional merely because it

caused the plaintiff serious injury"); *see also Scott v. Cty. of Nassau*, 1998 WL 874840, *5 (E.D.N.Y. 1998) ("Without additional allegations of excessive force or blatant disregard for preexisting injuries, complaints, or requests for medical treatment, the use of handcuffs has been found to be reasonable.").

No proof exists on this record that the officers used excessive force. Accordingly, Sanders's claims for excessive force, assault, and battery are dismissed.

### 4.    Municipal Liability

Sanders further alleges that the City maintained a "defective warrant procurement policy" and defectively executed a "no-knock warrant policy," and that the City negligently instructed, hired, trained, and supervised the officers. (Dkt. # 1 at ¶¶ 33-35, 39).

As the above-analysis makes clear, Sanders has "failed to establish a predicate constitutional violation sufficient to sustain a *Monell* claim against [d]efendant[s]." *Merriweather v. City of New York*, 2015 WL 57399, *14 (S.D.N.Y. 2015). For this reason alone, summary judgment in favor of the defendants on Sanders's municipal liability claims is appropriate.[14] *See, e.g.*, *id.*; *see also Leon*, 2010 WL 2927440 at *5 ("A municipality cannot be liable for acts by its employees which are not constitutional violations. . . . Because [p]laintiffs have not adequately alleged any underlying constitutional violations, their claim for *Monell* liability also fails."); *Ferraresso*, 646 F. Supp. 2d at 309 ("The Court already has found that [plaintiff] did not suffer any constitutional tort. As a result, his constitutional claim against the [municipal defendant]

---

[14] To the extent that Sanders's claim for negligent instruction, hiring, training, and supervision is pled under New York State law, which is not at all clear, that claim is also dismissed because there is no dispute that the officers' conduct at issue arose while they were acting within the scope of their employment. *See McKnight v. City of Rochester*, 2015 WL 1462379, *2-4 (W.D.N.Y. 2015) ("courts routinely dismiss negligent hiring, training and supervision claims asserted against municipalities arising out of the conduct of police officers who were acting within the scope of their employment") (collecting cases).

necessarily fails as well."); *Bancroft*, 672 F. Supp. 2d at 408 ("since there was no violation of the plaintiffs' constitutional rights, the City has incurred no liability under the rule of *Monell*").

## **CONCLUSION**

For the above-stated reasons, defendants' motion for summary judgment (Dkt. # 35) is **GRANTED**, and Sanders's cross motion for summary judgment (Dkt. # 39) is **DENIED**. Sanders's Complaint (Dkt. # 1), therefore, is dismissed in its entirety and with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      February 6, 2019.